[Cite as *State v. Stearns*, 2024-Ohio-714.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                        |   | JUDGES:                        |
|------------------------|---|--------------------------------|
| STATE OF OHIO          | : | Hon. Patricia A. Delaney, P.J. |
|                        | : | Hon. W. Scott Gwin J.          |
| Plaintiff-Appellee     | : | Hon. John W. Wise J.           |
|                        | : |                                |
| -vs-                   | : |                                |
|                        | : | Case No. 2023 CA 00083         |
| KYNAN STEARNS          | : |                                |
|                        | : |                                |
| Defendant-Appellant    | : | OPINION                        |

CHARACTER OF PROCEEDING:     Appeal from the Stark County Court of
                             Common Pleas, Case No. 2023 CR 0067A

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      February 26,, 2024

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

KYLE STONE                                DONOVAN R. HILL
Stark County Prosecutor                   122 Market Avenue North
BY VICKI L. DESANTIS                      Dewalt Building, Suite 101
Assistant Prosecutor                      Canton, OH 44702
110 Central Plaza South, Ste. 510
Canton, OH  44702

*Gwin, J.,*

{¶1}    Appellant Kynan M. Stearns appeals from the judgment entry of the Stark County Court of Common Pleas.  Appellee is the State of Ohio.

*Facts & Procedural History*

{¶2}    On January 12, 2023, appellant was charged with one count of robbery, a felony of the second degree, in violation of R.C. 2911.02(A).  The trial court held a jury trial beginning on July 5, 2023.

{¶3}    J.R. was an assistant manager at the Circle K store in Louisville, Ohio.  She was working the midnight shift by herself on December 30, 2022.  While she was working on the computer in the office, she heard the bell ring.  She looked on the camera and saw someone walk in around 3:00 a.m.  J.R. walked out of the office, and the customer's back was towards her.  When J.R. said "hello," the customer turned around, looked at her, and said, "do not move, just sit on the floor."  The customer had what J.R. thought looked like a police baton in his hand.

{¶4}    J.R. was sitting on the floor when someone else came into the store.  He told her to put her shirt up over her face, which she did.  The two individuals that came into the store had masks on, but J.R. could tell they were both males.  When appellant initially came into the store, the mask covered only part of his face. J.R. could see appellant's eyes and forehead.  J.R. could "kind of see" through her shirt, and saw the perpetrators behind the counter rummaging through items and opening up drawers.  At some point, one of the individuals that J.R. identified as appellant went into the office, flung items everywhere, and threw a drawer on the sales floor.  The individual that came into the store first left through the front door.  The second individual was trying to wheel

the trash can to the door, but it flipped over and he was trying to get items back into it. He ran out the back door. On his way out, he slapped J.R. across the face. A police officer came into the store and took J.R. to his vehicle. J.R. was checked out by medics, but was not taken to the hospital.

{¶5} There are surveillance cameras in the store that are always running. J.R. reviewed the videos several weeks prior to trial. On the video, J.R. saw one of the individuals pull down his mask. J.R. identified that individual as appellant. When asked on cross-examination how J.R. knew it was appellant, she stated, "because he looks like the picture from the front door when he didn't have his mask on." J.R. confirmed that the police did not do a photo line-up during their investigation.

{¶6} K.A. was doing a ride-along with Deputy McMillen in Louisville on December 30, 2022. They were sitting at the light at California Avenue and Main Street. K.A. and Deputy McMillen noticed someone at the doors of the Circle K waving them into the parking lot like they were in distress. As soon as the cruiser pulled into the parking lot, the person took off to the back of the store and ran out the back door. While the officer went into the store, K.A. remained in the cruiser. He saw the individual running across the parking lot to a light-colored Buick vehicle. K.A. did not have a clothing description for the individual, but he saw it was a black male. K.A. did not see enough of the individual to describe any other characteristics.

{¶7} Deputy Jason McMillen ("McMillen"), of the Stark County Sheriff's office was on duty on December 30, 2022. He took a civilian, K.A., for a ride-along that night. K.A. needed to use the restroom while they were on patrol. McMillen knew the Circle K was open all-night, so he was headed to the Circle K. When they were sitting at the traffic

light near the Circle K, McMillen saw a black male open the front door of the Circle K and wave towards McMillen like he needed help. McMillen pulled his car into the Circle K parking lot. As he was pulling into the parking lot, the black male at the door disappeared. McMillen got out of his patrol car and walked to the front door. He saw the clerk sitting on the floor. He entered the store and took the clerk to his cruiser. Then, he went back in and checked the store. McMillen identified multiple photographs of the crime scene.

{¶8} Officer Zachary Clark ("Clark") of the Louisville Police Department received a call about the robbery on December 30, 2022, when he was about a mile away from the scene. When he arrived at the scene, he spoke to the victim. She could not identify the suspect. Clark took photographs of the scene. He identified the photographs at trial. Clark bagged, tagged, and marked a black tennis shoe that was found at the scene and sent it to the Bureau of Criminal Investigation ("BCI") for DNA processing.

{¶9} Detective John Pilla ("Pilla") of the Louisville Police Department was called to the scene. He arrived when the store had already been ransacked. Pilla observed a black shoe left at the back door. Pilla identified photographs he took of the scene. The victim told Pilla the perpetrators were two black males, one wearing a black hoodie and one wearing a gray hoodie.

{¶10} Pilla obtained and viewed surveillance video from the store that night. Pilla also identified still photographs taken from various points during the surveillance video. Several of the still photographs showed the suspects. In one photograph, the mask of one of the suspects was pulled down, so Pilla got a look at his face. Pilla also observed that he was wearing black shoes. Pilla identified the shoe the suspect was wearing as the black shoe that was left behind at the scene. Pilla testified the first suspect was

wearing an "Arby's" jacket and the second suspect was wearing a "Gaming in Progress" hoodie.

{¶11} Pilla described the physical evidence found at the scene, including a black shoe, gum stuck to a cigarette carton near the cash register, and a cigarette pack with saliva on it. Pilla's investigation led him to a female named J.W., appellant's ex-girlfriend, who said she had information about the robbery. J.W. gave Pilla the names of "Kynan Stearns" and "JMoney." Upon further investigation, Pilla determined "JMoney's" real name was Jason Mitchell ("Mitchell"). After obtaining a search warrant, Pilla searched Mitchell's residence. Pilla found Circle K brand lighters, multiple cartons of cigarettes, and a box of beef jerky sticks. Pilla also found the "Gaming in Progress" hoodie. Pilla took the beef jerky sticks and carton of cigarettes to the Louisville Circle K store. The clerk at the store scanned them, and it popped up on their register confirming those items were specific to that store.

{¶12} Pilla located appellant on January 6, 2023. BCI needed a "DNA standard" from the suspects to complete the DNA testing on the items found at the scene. Pilla obtained a search warrant to get DNA samples from appellant and Mitchell. Pilla confirmed there was a match from appellant's DNA to the shoe found at the scene.

{¶13} Pilla testified that appellant sent a letter to J.W. on May 23, 2023, stating that she "need[ed] to make sure Karon knows what to say. He is not to tell my lawyer that he is my brother. He is to say that he was at our house when JMoney and Dana came over with the tobacco. He is my witness that I was at home with him on the night of the robbery. This is important, J.W. This is priority." Appellant wrote a letter to a friend on May 18, 2023 stating, "I really need you to talk to Karon so he knows what to say to

my lawyer for my trial, please. Karon is my alibi to where I was that night. He needs to say that me and him was at the house together when JMoney and someone else came over with tobacco products. I'm having my lawyer call him to trial for me."

{¶14} On cross-examination, Pilla testified he was not able to identify any suspects from the video surveillance footage.

{¶15} Brittany Troyer ("Troyer") from BCI testified about DNA testing procedures. Appellant was found to be a contributor to the DNA located on the black shoe located at the scene. Troyer estimated the proportion of the population that cannot be excluded as a possible major contributor is 1 in 10 million unrelated individuals. Neither the chewing gum or cigarettes had the DNA of appellant.

{¶16} Appellant testified in his own defense. Appellant stated Mitchell came to his house sometime prior to December 30, 2022 with another male named "Dana" who had allegedly run away from foster care and needed help. Appellant testified he gave Dana shoes and clothing. However, because Dana did not wear appellant's shoe size, appellant gave him J.W.'s black shoes. Appellant also gave Dana underwear, pants, hoodies, and shirts.

{¶17} Appellant stated that one morning, Mitchell and Dana came over to appellant's house to get high. Mitchell told appellant he "hit a lick" which appellant took to mean that Mitchell stole money or committed a robbery. Mitchell asked appellant to help him "sell some stuff," so appellant posted the items on Facebook. Appellant testified he was not at the Louisville Circle K on December 30, 2022 and stated he did not rob the store. Appellant believes the black shoe was the shoe he gave to Dana. Appellant confirmed he was previously convicted of felony burglary in 2015. Appellant also

confirmed he wrote the letters to J.W. and his friend. He testified he wrote them because he was scared to go to trial.

{¶18} On cross-examination, appellant stated he never told the police about "Dana." Appellant also admitted that, in the letters, he was trying to fabricate an alibi with his brother Karon. Appellant does not know why J.W.'s DNA was not in the shoe because it was her shoe.

{¶19} The jury found appellant guilty of robbery. The trial court memorialized the jury's verdict in a July 11, 2023 judgment entry. The trial court sentenced appellant to an indefinite prison term of five to seven and one-half years in prison. The trial court issued a judgment entry of sentence on July 25, 2023.

{¶20} Appellant appeals the July 25, 2023 judgment entry of the Stark County Court of Common Pleas and assigns the following as error:

{¶21} "I. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

I.

{¶22} In appellant's assignment of error, he argues the conviction for robbery is against the manifest weight of the evidence because the identification in the case was inherently unreliable.

{¶23} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must

be overturned and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶24} It is well-established, though, that the weight of the evidence and the credibility of the witnesses are determined by the trier of fact. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216. The jury is free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. *Id.*

{¶25} Appellant was found guilty of one count of robbery pursuant to R.C. 2911.02(A), which provides, in pertinent part:

(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control;

(2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;

(3) Use or threaten the immediate use of force against another.

{¶26} Appellant contends his conviction is against the manifest weight of the evidence because the evidence utilized to identify appellant as the person who committed the offense was not reliable.

{¶27} Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888. This truism is reflected in the state's constitutional burden to prove the guilt of the "accused" beyond a reasonable doubt. *In re Winship*, 397 U.S. 358,

90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Like any fact, the state can prove the identity of the accused by circumstantial or direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). A witness need not physically point out the defendant in the courtroom as long as there is sufficient direct or circumstantial evidence proving that the defendant was the perpetrator. *Id.*

{¶28} If the State relies on circumstantial evidence to prove an essential element of an offense, it is not necessary for "such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). Furthermore, "since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that i[t] weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Id.* While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990). Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case. *Id.*

{¶29} Appellant argues the totality of the circumstances demonstrates the risk of misidentification in this case is high because: the witness could not see appellant's entire face at the time of the crime; J.R. did not have a heightened degree of attention because she had a shirt over her face; J.R. was unable to describe the perpetrators to police; and J.R. did not view the surveillance video until several weeks prior to trial.

{¶30} In the instant case, there was no pretrial identification procedure. The same factors which are used in testing the reliability of a pretrial identification are used in

determining whether or not the in-court identification was of an independent origin. *State v. Culbertson*, 5th Dist. Stark No. 2018CA00183, 2020-Ohio-903. The factors affecting reliability include: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *State v. Moody*, 55 Ohio St.2d 64, 377 N.E.2d 1008 (1978).

**{¶31}** The Ohio Supreme Court explained that in determining the admissibility of an in-court identification, trial courts should consider whether the in-court identification was a product of an improper pretrial identification procedure or whether the in-court identification "came from some independent recollection and observation of the accused by the witness." *State v. Jackson*, 26 Ohio St.2d 74, 269 N.E.2d 118 (1971).

**{¶32}** In this case, there was not a pretrial identification such as a photo array where the victim selected appellant as the perpetrator. Police retrieved all of the surveillance video from the Circle K's cameras on December 30, 2022. There were also still pictures taken from the video, including one where appellant was standing in front of the store with his mask pulled down. The officers testified the videos and photographs of the scene were fair and accurate depictions of the surveillance footage from the Circle K.

**{¶33}** J.R. was shown the surveillance tape and photographs, and she immediately identified appellant as one of the perpetrators. The record reflects that the victim's in-court identification was based on her own observations and memory. Though the victim testified the suspect had a mask on, she stated the mask was not fully over his face. She also testified as to the location of each of the suspects during the robbery, and

confirmed on the surveillance video photographs that is where she saw each suspect on the night of the robbery. The victim's in-court identification was made under oath and subject to cross-examination. Defense counsel challenged her recollection of the incident.

{¶34} We find the victim had a reliable and independent basis for the identification based on her prior independent observations. We do not find that the victim's in-court identification denied appellant his right to a fair trial or caused a manifest miscarriage of justice. See *State v. Glenn-Coulverson*, 10th Dist. Franklin No. 16AP-265, 2017-Ohio-2671 (showing convenience store surveillance video to eyewitnesses was a valid and reliable investigative procedure as the video depicts actual events connected in time and space to the crime itself).

{¶35} In *State v. Johnson*, the court noted several factors indicating the identification was not unreliable: there were no suggestive out-of-court procedures that could have invalidated the in-court identification; the witness made her identification in court and under oath and was subject to cross-examination; the witness testified she observed the suspect for over a minute; and the witness was confident in her identification. 163 Ohio App.3d 132, 2005-Ohio-4243, 836 N.E.2d (10th Dist. 2005). This Court found an in-court identification reliable in *State v. Culbertson*, 5th Dist. Stark No. 2018CA00183, 2020-Ohio-903, in a factual scenario similar to this one. See also *State v. Daniels*, 5th Dist. Stark No. 2018CA00155, 2019-Ohio-3208 (identification not unreliable even though victim did not see who kicked in the door). Here, there was no suggestive out-of-court procedures that could have invalidated the in-court identification, J.R. made her identification in court and under oath and was subject to cross-

examination, J.R. testified she observed appellant several times as he was rummaging through the store when he did not have his mask fully on, and J.R. was confident in her identification.

{¶36} We find no merit in appellant's contention that the victim's in-court identification was tainted by her viewing of photographs from the surveillance video. The identification was based upon her own independent recollection of the events.

{¶37} Any type of direct or circumstantial evidence may be utilized to establish the identity of the perpetrator of a crime. *State v. Tyo*, 5th Dist. Stark No. 2016CA00223, 2018-Ohio-1374. The jury, as the trier of fact, was free to accept or reject any and all of the evidence offered by the parties and assess the witness' credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Johnson*, 5th Dist. Stark No. 2014CA00189, 2015-Ohio-3113. The jury need not believe all of a witness' testimony, but may accept only portions of it as true.

{¶38} Appellant's argument also overlooks the compelling evidence such as the surveillance video and the DNA evidence obtained from the black shoe left at the scene. *State v. Bias*, 10th Dist. Franklin No. 21AP-329, 2022-Ohio-4643 (other circumstantial evidence established the defendant was the shooter such as DNA); *State v. Guevara,* 10th Dist. Franklin No. 21AP-414, 2023-Ohio-1448 (state may establish identity of perpetrator through use of DNA even if victim was not able to definitively identify perpetrator). Appellant's DNA was found on the black tennis shoe that the officers found at the scene and matched the shoe the perpetrator was wearing in the surveillance video.

Appellant admitted to being friends with Mitchell, and admitted that he posted pictures of some of the stolen items on Facebook. The jury heard appellant's voice in the surveillance video and at trial.

{¶39} Finally, appellant argues that, even if the identification was not unreliable, there are other reasons why the jury's verdict is against the manifest weight of the evidence. Appellant contends: the tip to police about appellant came from his ex-girlfriend who appellant testified was not truthful, the stolen merchandise was not located in appellant's house, and a second contributor's DNA was on the shoe.

{¶40} However, there is no indication the tip by J.W. is unreliable. The tip led Pilla to appellant and Mitchell. Appellant and Mitchell's DNA matched the items of clothing worn by the suspects during the robbery. The police found the stolen merchandise at Mitchell's home, and found appellant's Facebook post of the stolen items. Though the stolen items were not found in appellant's home, he listed them on Facebook. Further, the jury could reasonably reject the self-serving testimony of appellant. Appellant admitted that he attempted to fabricate an alibi for the night of the robbery. While appellant was certainly free to argue that "Dana" committed the crime and that the eyewitness identification was unreliable, on a full review of the record, we cannot say the jury clearly lost its way or created a manifest injustice by choosing to believe the testimony of J.R. and the other witnesses.

{¶41} The jury verdict finding appellant guilty of robbery was not against the manifest weight of the evidence. Appellant's assignment of error is overruled. The judgment entry of conviction of the Stark County Court of Common Pleas is affirmed.

By Gwin, J.,

Delaney, P.J., and

Wise, J., concur